**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　vs.<br><br>JEFF LIVINGSTON,<br><br>　　　　　Defendant.<br>_____ / | CASE NO. CR-F-09-273 LJO<br><br>**ORDER ON DEFENDANTS' MOTION TO DISMISS** (Doc. 56) |

## INTRODUCTION

Defendant Jeff Livingston ("Mr. Livingston") moves to dismiss the indictment against him on the grounds that, as a matter of law, the government cannot establish an essential element of the offense; to wit, that the gaming establishment, the Chuckchansi Gold Resort and Casino ("Casino"), was operated pursuant to an ordinance approved by the National Indian Gaming Commission ("NIGC"). Mr. Livingston argues the California Rancheria Act terminated the status of the land in 1958, and was never restored to "Indian land" status during the relevant time period. The government contends that stipulated judgments and the agency opinion letters establish that the Casino operated on "Indian land" during the relevant time period. Having considered the parties' arguments, exhibits, and the applicable case law, this Court finds that Mr. Livingston fails to meet his burden to prove that the government cannot, as a matter of law, establish an essential element of the crime. Accordingly, this Court DENIES the motion to dismiss.

1

# BACKGROUND

## Charges and Ordinance

Mr. Livingston is charged with two counts of violating 18 U.S.C. §1168(b), entitled "theft by an officer or employee of a gaming establishment on Indian lands." 18 U.S.C. §1168(b) reads:

> Whoever, being an officer, employee, or individual licensee of a gaming establishment operated by or for or licensed by an Indian tribe pursuant to an ordinance or resolution approved by the National Indian Gaming Commission, embezzles, abstracts, purloins, willfully misapplies, or takes and carries away with intent to steal, any moneys, funds, assets, or other property of such establishment of a value in excess of $ 1,000 shall be fined not more than $ 1,000,000 or imprisoned for not more than twenty years, or both.

Each count alleges that Mr. Livingston was an employee of a gaming establishment, Casino, operated by an Indian tribe, the Picayune Rancheria of the Chukchansi Indians ("Tribe"), pursuant to an ordinance approved by the NIGC, and that Mr. Livingston stole from the Casino. The indictment charges Mr. Livingston with theft on or about May 2007 and July 2007.

The question presented in this motion is whether the Casino was operated by the Tribe "pursuant to an ordinance or resolution approved by the National Indian Gaming Commission" as required by the statute. It is undisputed that Tribe passed a gaming ordinance, Resolution No. 1996-08, on June 24, 1996, and that the NIGC approved the Tribe's gaming ordinance on June 27, 1996. The NIGC's June 27, 1996 ordinance approval letter explains that "scope of the [NIGC] Chairman's review and approval is limited to the requirements of the IGRA and the NICG regulations." The letter cautions the Tribe: "It is important to note that the gaming ordinance is approved for gaming only on Indian lands as defined in the IGRA."

Mr. Livingston argues that the NIGC approval is limited, and applies only to the extent that the Casino was on "Indian land" during the relevant times of the indictment. Mr. Livingston contends that the Casino was not on Indian land during the relevant time period, because the Indian land status was terminated and not restored until it was placed back into trust on July 31, 2007. Mr. Livingston submits that because the land on which the Casino sits was not Indian land during the relevant time period, it was not a gaming establishment operating pursuant to the NIGC's approval, which approved "gaming only on Indian lands." Mr. Livingston concludes that because the Casino was not operated pursuant to an ordinance approved by the NIGC, the government cannot state an essential element of the crime.

The government maintains that the Casino was operated by the Tribe pursuant to NIGC's approval of the Tribe's gaming ordinance. The government argues that the June 27, 1996 letter was not conditional, and approved the gaming at the Casino. The government further argues that the Casino land qualified as "Indian land" based on the restoration of its rancheria status by *Tille Hardwick et al. v. United States*, No. C-79-1710 SW (N.D. Cal. 1979) ("*Hardwick*") litigation. The government also relies on government opinion letters that conclude that the Casino was on Indian land during the relevant period of time.

To resolve the issue presented, this Court considers the history of the Casino land in question, the *Hardwick* litigation, the NIGC approval and federal opinion letters, and the post-*Hardwick* decisions.

### Creation and Termination of Trust

The Picayune Rancheria was first established by Executive Order of April 24, 1912, issued by President William H. Taft. The Executive Order, *inter alia*, designated 80 acres of land in Madera County to be held in trust by the United States for "Indian use." The land was occupied by one family, who did not form a tribal government or seek recognition as a tribal entity.

In1958, Congress passed the California Rancheria Act, Public Law 85-671, 72 Stat. 619, to terminate the trust relationship between the United States and numerous Indian parcels in California, including the Picayune Rancheria. Under the California Rancheria Act, Congress terminated the alienation restrictions and distributed in fee simple title to the land that comprised the rancheria. The federal trust relationship with the land was officially terminated in 1966. The land was distributed and the parcels were eventually sold to non-Indians.

### *Hardwick* Litigation and Tribal Organization

In 1979, a class action lawsuit was filed in the Northern District of California to challenge the termination of the trust relationship under the California Rancheria Act. *Tille Hardwick et al. v. United States*, No. C-79-1710 SW (N.D. Cal. 1979) ("*Hardwick*"). *Hardwick* purportedly was filed on behalf of individual members of rancherias, and 34 terminated rancherias, including the Picayune Rancheria. The rancherias sought, among other things, to "unterminate" each of the subject rancherias and to hold the same in trust for the benefit of the Indians of the original Rancheria; and for the subject rancherias to be treated as Indian reservations in all respects.

On December 27, 1983, the court entered judgment be entered in favor of some of the *Hardwick* plaintiffs according to the terms of a stipulation for entry of judgment filed by the parties on August 2, 1983 ("1983 Stipulation"). The 1983 Stipulation identifies the Picayune Rancheria as one of the 17 rancherias subject to its provisions. The 1983 Stipulation restored the Indian status of the named plaintiffs and other class members of the 17 rancherias. The 1983 Stipulation provided a mechanism for owners of fee land to re-submit previous lands to the United States to hold in trust for the benefit of the Tribes. The 1983 Stipulation provided, however, that the Court:

> shall not include in any judgment entered pursuant to this stipulation any determination of whether or to what extent the boundaries of the rancherias listed and described in paragraph 1 shall be restored and shall retain jurisdiction to resolve this issue in further proceedings herein.

1983 Stipulation, para. 5. The 1983 Stipulation was signed by the United States federal defendants and the class action plaintiffs' attorney.

The Tribe did not take immediate action to organize its government after entry of the 1983 Stipulation and judgment. The Tribe held its first formal meeting to organize its tribal government in August 1986. Internal disputes over Tribal control erupted, factions emerged, and subsequent dueling applications for approval were denied.

While the Tribe was organizing its government, questions arose as to the boundaries of the rancheria, and as to the tax consequences flowing from the termination and later restoration of the Tribe. In 1987, the Picayune Rancheria and the County of Madera entered into a stipulation for entry of judgment ("1987 Stipulation"). Pursuant to the 1987 Stipulation, the Picayune Rancheria was "never" and is "not now lawfully terminated under the California Rancheria Act" because "the requirements of section 3 of the [California Rancheria] Act were not fulfilled prior to the conveyance of the deeds to the Rancheria Parcels." Pursuant to the 1987 Stipulation, the "original boundaries" of the rancheria was "restored, and all land within these restored boundaries...[was] declared to be 'Indian Country.'"[1] The

---

[1] Indian County, as defined by 18 U.S.C. §1151, includes:

(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within

1  parties agreed further that Picayune Rancheria "shall be treated by the County of Madera and the United
2  States of America, [sic] as any other federally recognized Indian Reservation." The 1987 Stipulation
3  was signed by an attorney for the plaintiffs, and an attorney for the County of Madera. The court entered
4  judgment pursuant to the parties' stipulated terms.

5  At the time of the 1987 Stipulation, there were seven parcels of land within the boundaries of the
6  rancheria. One was held by an Indian, the other six parcels were held by non-Indians. The Tribe as a
7  whole adopted a Tribal Constitution on November 7, 1988. Seeking to re-establish its reservation lands,
8  began purchasing the six parcels. The Tribe re-acquired the last of the parcels in 2002.

**Approval of Picayune Gaming Compact**

10  In addition to the 1996 NIGC approval letter, the Tribe entered into a gaming agreement with
11  the State of California that was approved by the NIGC in 2000. On September 10, 1999, the Tribe
12  entered into a Tribal-State Compact with the State of California related to gaming ("Compact"). The
13  Tribe submitted that Compact to the NIGC for review. On May 5, 2000, the United States Department
14  of Interior issued a letter opinion that the Compact "does not violate the Indian Gaming Regulatory Act."
15  The May 5, 2000 letter approved the Compact. Noting that the Compact provides that gaming shall take
16  place on "reservation" land located within Madera County, the letter makes clear, however, that "the
17  terms of this Compact are approved only to the extent that they authorize gaming on 'Indian lands' as
18  defined in IGRA, now or hereafter acquired by the Tribe."

**Federal Opinions Letters Regarding Casino Indian Lands Status**

20  After the Tribe approved its gaming ordinance, the status of its land as "Indian land" was called
21  into question. A series of opinion letters between 1999-2001 demonstrate that the federal government
22  believed the land to be "Indian lands" as defined by the IGRA. In forming these opinions, the
23  government opinion letters relied on the 1983 and 1987 Stipulations.

24  A July 2, 1999 letter from the Bureau of Indian Affairs to the Office of the Solicitor responds to
25  a request to submit "data pertaining to the Picayune Rancheria that may assist [the Office] in making a

---

27  the original or subsequently acquired territory thereof, and whether within or without the limits of a state,
   and (c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way
28  running through the same.

5

determination as to whether or not the lands currently being utilized for gaming purposes meet the definition of 'Indian lands' as set forth in" in the IGRA.  The July 2, 1999 letter provides the following information:

> [A]s early as 1993, the Picayune Rancheria has discussed its intent to establish a gaming facility.  In 1996, the Picayune Rancheria advised of its plans to establish a casino on nontrust lands located within the exterior boundaries of the Picayune Rancheria as reinstated pursuant to the 1987 Stipulation entered by Madera Count in [Hardwick].
>
> In the said 1987 Stipulation, Madera County stipulated to the creation of "Indian Country" for all lands within the restored Rancheria boundaries.  We have no record that the U.S. stipulated to the restoration of Picayune's boundaries or the creation of Indian Country in Hardwick as was accomplished for other rancherias located in Humbolt, Mendocino, Lake, Plumas, and Tuolumne Counties.

A March 2, 2000 letter written by the Department of Interior, Division of Indian Affairs ("Department") responded to an NIGC request for "a legal opinion regarding whether fee land in California purchased by the Picayune Tribe in 1996, which is within the boundaries of the Picayune Rancheria, falls within the definition of 'Indian lands'" under the IGRA.  The March 2, 2000 letter "conclude[d] that the lands are 'Indian lands' and therefore may be used for Indian gaming operations on the property."  In arriving at this conclusion, the Department relied on the 1983 and 1987 Stipulations.  The letter explained that in the 1983 Stipulation, the government "agreed that the individual members of the Rancherias would be restored to their status as Indians and the U.S. would recognize the Indian Tribes...of the seventeen rancherias as Indian entities with the same status as they possessed prior to distribution of these Rancherias."  The letter recognizes that the United States did not sign the 1987 Stipulation, but takes the position that in signing the underlying 1983 Stipulation, the government anticipated "further proceedings" to determine the boundaries of the Picayune Rancheria.  In the March 2, 2000 letter, the government states that "the United States considers itself bound by both stipulations."  The March 2, 2000 letter affirms that the land qualifies as "Indian lands" as a reservation.

After the approval of the Compact by the NIGC, the State of California questioned "whether the casino will be operating on a reservation."  In a December 3, 2001 letter to the State of California, the NIGC "adopted the Department of Interior's views," "concurr[ed] with the Department" and "likewise conclude[d] that the proposed gaming operation is located on lands considered "Indian lands" pursuant to" the IGCA.  The December 3, 2001 letter noted the Department's conclusion "was based largely" on

the *Hardwick* litigation and stipulations. The NIGC also concludes that the Picayune land proposed for gaming "should be treated as a reservation," and qualifies as Indian lands pursuant to 25 U.S.C. §2703(4)(A). In addition, because the land qualifies as reservation, the NIGC concluded that the land need not be taken into trust to qualify as "Indian lands" under the IGRA. The NIGC's December 3, 2001 opinion letter also relies on the Hardwick litigation and stipulations as well as a subsequent case interpreting the litigation, *Government Council of Pinoleville Indian Community v. Mendocino County*, 684 F. Supp. 12042 (N.D. Cal. 1988).

## Post-*Hardwick* Litigation

In 2003, the Tribe completed construction of the Casino. The County of Madera re-assessed the value of the property's ad valorem property tax liability and attempted to assesses the taxes against the Tribe. The Tribe disputed tax liability.

In 2004, the County of Madera moved to enforce the judgment of the 1987 Stipulation in Northern District of California, relying on a provision of the 1987 Stipulation related to the assessment of ad valorem taxes. The motion was denied in a May 19, 2004 order. The court concluded that because the Tribe had not yet been organized at the time of the 1987 Stipulation, the Tribe could not have been a party to either the *Hardwick* litigation or to the 1987 Stipulation. The court recognized that the Tribe was a federally recognized Tribe in 1983, based on the 1983 Stipulation, but that because the Tribe had not waived its sovereign immunity expressly, the Tribe could not be bound by the 1987 Stipulation and judgment. The court denied the motion on the alternative grounds that the 1987 Stipulation would not provide the relief sought by the County of Madera. The court denied a subsequent motion for reconsideration on October 13, 2004.

Rather than appeal the Northern District's decision, the County of Madera filed an in rem action in Madera County Superior Court on October 25, 2004. The action sought declaratory relief as to the taxability of the land owned in fee by the Tribe. The Tribe moved to quash or dismiss the in rem complaint.

In 2006, the Tribe decided to expand the Casino to include additional hotel rooms, a weight room and spa facility, additional parking facilities, improved waste water treatment plant, warehouse storage facility and a children's area. On September 1, 2006, the County of Madera sent the Tribe a letter

asserting for the first time that the California Environmental Quality Act ("CEQA") government the Casino's expansion and indicated that the Tribe must not proceed with the expansion without acquiring the necessary permits. The Tribe brought a motion in the Northern District to enforce the 1987 Stipulation. Because the court had determined that the Tribe was a non-party in 2004, the Tribe argued that it could enforce the 1987 Stipulation as an intended third party beneficiary of the 1987 Stipulation.

After the Tribe filed the 2006 motion to enforce judgment, but before the motion was heard, County of Madera filed a second state court action in Madera County Superior Court seeking to restrain the Tribe from proceeding with the expansion of the Casino. The Tribe removed that action to the Eastern District of California.

In its December 6, 2006 opinion, the Northern District reiterated its prior conclusion that the Tribe is not a party to the 1987 Stipulated Judgment. In its order, the court noted that the Tribe's arguments are based not only on the 1987 Stipulation, but are also grounded in federal law, the Compact, the Memorandum of Understanding between the Tribe and County of Madera, and the County's alleged waiver of jurisdiction over the Casino. The court concluded that "these matters go far beyond the scope of the 1987 Stipulated Judgment, and thus more properly addressed in a new action for declaratory relief. Accordingly, the Court will deny the Tribe's motion for enforcement of judgment without prejudice to the Tribe's filing of a declaratory relief action."

Less than a week later, the Madera County Superior Court issued its decision on the pending motion to quash or dismiss the in rem complaint. In a December 12, 2006 opinion, the court found that it had in rem jurisdiction over the Casino land, because the property was held in fee simple as opposed to being held in trust, and the property was physically located within a local government entity of the State. The court further found that it *Hardwick* litigation did not divest the court of in rem jurisdiction, in part, because the Northern District found in its 2004 and 2006 orders that it lacked personal jurisdiction over the Tribe.

In a December 18, 2006 decision, the Eastern District of California issued an order on the motions for remand, transfer, and for a temporary restraining order that were pending the case the Tribe removed to that court. *County of Madera v. Picayune Rancheria of Chukchansi Indians*, 467 F. Supp. 2d. 993 (E.D. Cal. 2006). The court granted the County's motion to remand and denied as moot the

1  motion to transfer venue to the Northern District, and the motion for a temporary restraining order. The
2  court found that it lacked jurisdiction over the action because both parties agreed that the court lacked
3  jurisdiction (although for different reasons), and the complaint does not allege a federal claim on its face.
4  Accordingly, the court remanded the action back to the Madera County Superior Court for further
5  proceedings.

6    Based on the Northern District's December 9, 2010 dismissal without prejudice, the Tribe filed
7  a declaratory relief action against Madera County in the Northern District on December 12, 2006, and
8  moved to relate that action to the *Hardwick* litigation. That case eventually settled in March 2007.
9  Before it settled, however, the court issued a February 1, 2007 order. In the order, the court recognized
10 that it had ruled previously that the Tribe was not a party to, and was not bound by, the 1987 Stipulated
11 Judgment. Interestingly, the court concluded in its February 1, 2007 order that the Tribe had stated a
12 basis for federal jurisdiction, because the Tribe was seeking a declaration of its rights to occupy and
13 control its tribal lands. Specifically, the court noted that the Tribe was seeking a declaration that it has
14 rights to occupy and control lands that constitute "Indian country." The basis of the Tribe's position was
15 the 1987 Stipulation.

16                **Current Status**

17   On July 31, 2007, all of the land comprising the original Picayune rancheria was placed back into
18 trust, held by the United States. The parties do not dispute that at this time, the land now qualifies as
19 "Indian land" pursuant to 25 U.S.C. §2703(4)(B). On February 2, 2009, the Tribe submitted an amended
20 request for approval of its gaming ordinance to the NIGC. The NIGC approved the Tribe's amended
21 ordinance on March 27, 2009. Accordingly, there is no issue as to the current status of the Casino as
22 Indian land.

23                S<small>TANDARD OF</small> R<small>EVIEW</small>

24   Mr. Livingston moves to dismiss the indictment pursuant to Fed. R. Crim. P. 12(b)(2). Mr.
25 Livingston may bring a motion that the indictment fails to state an offense at any time during the
26 pendency of the proceedings. Fed. R. Crim. P. 12(b) permits Mr. Livingston to raise any defense "that
27 the court can determine without a trial of the general issue." *Id.*; *United States v. Shortt Accountancy*
28 *Corp.*, 785 F.2d 1448, 1452 (9th Cir.), *cert. denied*, 478 U.S. 1007 (1986). "A pretrial motion is

1  'capable of determination' before trial if it involves questions of law rather than fact." *Id*. "Whether an
2  information is sufficient to charge a defendant is a particular situation is a question of law." *United
3  States v. Linares*, 921 F.2d 841, 843 (9th Cir. 1990). Accordingly, this Court may decide whether the
4  indictment fails as a matter of law.

5        "A district court may make preliminary findings of fact necessary to decide the questions of law
6  presented by pre-trial motions so long as the court's findings to not invade the province of the ultimate
7  finder of fact." *United States v. Jones*, 542 F.2d, 661, 664 (9th Cir. 1976). "As the ultimate finder of fact
8  is concerned with the general issue of guilt, a motion requiring factual determinations may be decided
9  before trial if 'trial of the facts surrounding the commission of the alleged offense would be of no
10 assistance in determining the validity of the defense.'" *Shortt*, 785 F.2d at 1252 (quoting *United States
11 v. Covington*, 395 U.S. 57, 60 (1969)). A "motion to dismiss the indictment cannot be used as a device
12 for a summary trial of the evidence." *United States v. Boren,* 278 F.3d 911, 914 (9th Cir. 2002); *see also
13 United States v. Sampson*, 371 U.S. 75, 78-79 (1962) ("Of course, none of these charges have been
14 established by evidence, but at this stage of the proceedings the indictment must be tested by its
15 sufficiency to charge an offense."). The "unavailability of Rule 12 in determination of general issues
16 of guilt or innocence ... helps ensure that the respective provinces of the judge and jury are respected...."
17 *United States v. Nukida*, 8 F.3d 665, 670 (9th Cir.1993). Accordingly, if this Court finds that there
18 factual issues going to the guilt of the defendant, this Court must defer those issues to the ultimate fact-
19 finder. *United States v. Nukida*, 8 F.3d 665, 669 (9th Cir. 1993) (a Rule 12(b) motion to dismiss is not
20 the proper way to raise a factual defense).

21                                 **DISCUSSION**

22       The Court must resolve whether the Casino was operating pursuant to an ordinance approved by
23 the NIGC pursuant to the IGRA to satisfy the element of 18 U.S.C. §1168(b). The parties do not dispute
24 that the California Rancheria Act terminated the rancheria, and that during the relevant time period, the
25 land was not held in trust. Thus, the parties dispute whether the land on which the Casino operated
26 qualified as a "reservation," pursuant to 25 U.S.C. §2703(4)(A).

27       Mr. Livingston argues that the Casino was not on "Indian land" during the relevant time period,
28 because Congress had not repealed the California Rancheria Act. Mr. Livingston maintains that

Congress has exclusive power to regulate and dispose of land belonging to the United States pursuant to the Property Clause of the Constitution, U.S. Const. Art. IV, §3, cl. 2, and that the 1983 and 1987 Stipulations could not undo the act of Congress. Mr. Livingston contends that the "touchstone" to determine whether the Rancheria Act diminished the reservation boundaries is Congress' intent at the time the statute was enacted, and that Congress unequivocally intended to terminate the federal trust relationship with the land with the Rancheria Act. Mr. Livingston argues that at no time subsequent to the 1958 California Rancheria Act has Congress repealed the termination of the Picayune Rancheria. Mr. Livingston concludes that the government lacked authority to restore terminated rancherias, the stipulations could not restore the reservation status to the Picayune Rancheria, and because the Tribe failed to place the land back into trust, the land does not qualify as "Indian lands" within the meaning of the IGRA during the relevant time period.

The government argues that the 1983 and 1987 Stipulations restored the Tribe and its land as a reservation, qualifying the land as "Indian land" within the meaning of IGRA. In addition, the government argues that the June 27, 2006 approval letter was unlimited and not site specific. The government contends that the ordinance was a general approval for gaming on Indian lands that was in effect during the relevant time period. The government concludes that the element of the crime is established.

In reply, Mr. Livingston counters that the *Hardwick* stipulations, to which neither the United States nor the Tribe was a party, did not restore the land to rancheria status. Mr. Livingston suggests that "every court to consider the 1987 Stipulation has rejected the government's position" and that the government's argument that the 1987 Stipulation restored the status of the Picayune land is inconsistent with the post-*Hardwick* cases in the Northern and Eastern Districts and Madera County.

The Court considers the parties' arguments in turn.

**1.    Whether the June 26, 1996 Approval Letter Limited Approval to Indian Lands**

The Court first considers whether the June 27, 1996 ordinance approval letter satisfies the element of the crime.

In 1988, Congress passed the IGRA, 100 P.L. 497; 102 Stat. 2467, to regulate gaming on Indian lands. Among other things, the IGRA created the crime of "theft by officers or employees of gaming

establishments on Indian lands." This crime is codified at 18 U.S.C. §1168(b), which provides:

> Whoever, being an officer, employee, or individual licensee of a gaming establishment operated by or for or licensed by an Indian tribe pursuant to an ordinance or resolution approved by the National Indian Gaming Commission, embezzles, abstracts, purloins, willfully misapplies, or takes and carries away with intent to steal, any moneys, funds, assets, or other property of such establishment of a value in excess of $ 1,000 shall be fined not more than $ 1,000,000 or imprisoned for not more than twenty years, or both.

Mr. Livingston is charged with two counts of "theft by officers or employees of gaming establishments on Indian lands." 18 U.S.C. §1168(b).

No published opinions analyze the elements of this crime. In addition, the Ninth Circuit Manual of Model Criminal Jury Instructions has no model jury instruction related to this statute. The parties previously stipulated to the following jury instruction, setting forth the elements of this crime:

> Defendant Livingston is charged in Counts One and Two of the Indictment with Theft by an Officer or Employee of a Gaming Establishment on Indian Land, in violation of section 1168(b) of Title 18 of the United States Code. For defendant Livingston to be found guilty of this charge, the government must prove each of the following elements beyond a reasonable doubt:
>
> First, defendant Livingston was an officer or employee of an Indian gaming establishment;
> Second, the Indian gaming establishment was operated by or for, or licensed by, an Indian tribe pursuant to an ordinance or resolution approved by the National Indian Gaming Commission;
> Third, on or about the dates alleged in the Indictment, defendant Livingston willfully embezzled or misapplied, or took with the intent to steal, moneys, funds, assets or other property of the Indian gaming establishment; and
> Fourth, that the value of such moneys, funds, assets or other property was in excess of $1,000.

The stipulated jury instruction properly and accurately sets forth the elements of the crime.

To establish a violation of 18 U.S.C. §1168(b), the government bears the burden to prove beyond a reasonable doubt, *inter alia*, that the Casino "was operated by or for, or licensed by an Indian tribe pursuant to an ordinance or resolution approved by the National Indian Gaming Commission." In this motion, defendants bear the burden to establish that the government cannot establish this element.

As set forth above, the parties do not dispute that the Tribe passed an ordinance in 1996 that was approved by the NIGC. Defendants argue that the approval was limited to gaming on Indian lands, and because the Casino was not located on Indian lands, the Casino was not operated pursuant to the approval. The government argues that since the ordinance is not site specific, the language is "simply

a reminder that the Tribe can only game on 'Indian lands.'" For the following reasons, this Court finds the government's argument unpersuasive.

First, the NIGC's June 27, 1996 ordinance approval letter makes clear that the NIGC approves gaming only on Indian lands.  The letter explains that "scope of the [NIGC] Chairman's review and approval is limited to the requirements of the IGRA and the NICG regulations."  The letter cautions the Tribe: "It is important to note that the gaming ordinance is approved for gaming only on Indian lands as defined in the IGRA."  The plain language of the approval letter makes clear that the approval is limited in scope, and that only gaming on Indian lands is approved by NIGC.

Second, the IGRA restricts approval of gaming on Indian lands.  The Chairman of the NIGC "shall" approve an ordinance onl if it meets the requirements of the IGRA. 25 U.S.C. §2710(e).  One of the requirements of NIGC approval of a gaming ordinance is that the gaming establishment must be located on "Indian lands."  "IGRA limits gaming to locations on Indian lands' as defined in 25 U.S.C. §2703(4)*.*" *N. County Comty. Alliance, Inc. v. Salazar*, 573 F.3d 738, 741 (9th Cir. 2009) ("*North County*").  *See also*, COHEN'S HANDBOOK ON FEDERAL INDIAN LAW §12.02 (2009) ("Gaming is permitted only on *Indian lands*.") (emphasis in original).  As the *North County* court explained:.

> IGRA provides that Congress finds that "Federal law does not provide clear standards or regulations for the conduct of gaming on *Indian lands*." 25 U.S.C. § 2701(3) (emphasis added). IGRA establishes "independent Federal regulatory authority" and "Federal standards" for gaming "on *Indian lands*." *Id*. § 2702(3) (emphasis added). IGRA provides that an Indian tribe can engage in "class II gaming *on Indian lands* within such tribe's jurisdiction" if certain conditions are met. *Id.* § 2710(b)(1) (emphasis added). Indian tribes are required to issue separate licenses "for each place, facility, or location *on Indian lands* at which class II gaming is conducted." Id. (emphasis added). IGRA provides that class III gaming "shall be lawful *on Indian lands only*" if certain conditions are met. Id. § 2710(d)(1) (emphasis added).

*North County*, 573 F.3d at 744.  The IGRA defines "Indian land" as

(A) all lands within the limits of any Indian reservation; and
(B) any lands title to which is either held in trust by the United States for the benefits of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. §2703(4). NIGC regulations have further clarified the Indian lands definition, providing that: "Indian land" means land "within the limits of an Indian reservation." 25 C.RF.R. § 502.12(a).  Thus, under the IGRA, the NIGC only has power to approve a gaming establish that operates on Indian land.

13

Third, the title of the crime and the information and indictment against Mr. Livingston make clear that the theft must take place on "Indian lands."

Based on the foregoing, this Court finds that the 1996 NIGC approval was subject to a limitation explicitly stated in the approval letter; namely, that the NIGC approved the Tribe's ordinance for gaming only on Indian land." Accordingly, to satisfy the element of this crime, the government must prove at trial beyond a reasonable doubt that Casino was on Indian land at the time in question. To carry his burden on this pre-trial motion to dismiss, Mr. Livingston must prove that the land was not "Indian lands" as a matter of law.

**2.     Whether the *Hardwick* Court had the Authority to Restore the Terminated Tribe**

Mr. Livingston contends that the clear intent of Congress in passing the California Rancheria Act was to terminate the land, and that an act of Congress repudiating the California Rancheria Act was required to restore the rancheria to "Indian land" status. Mr. Livingston asserts that Congress has the exclusive power under the Property Clause to regulate lands, and that the *Hardwick* Stipulations could not, as a matter of law, undo the California Rancheria Act. Mr. Livingston's argument places importance on Congressional policy at the time the California Rancheria Act was passed, and suggests that this Court ignore the intent of subsequent Congresses and their acts. In considering Mr. Livingston's arguments, this Court places the California Rancheria Act in the context of the Congressional termination policy, which was followed by a period of restoration and self-determination.

Termination became an official Indian policy when the House of Representatives passed a resolution on July 1, 1952, directing the Committee on Interior and Insular Affairs to conduct a full investigation into BIA activities and to formulate legislative proposals "designed to promote the earliest practicable termination of all federal supervision and control over Indians." H.R. Rep. No. 82-2503, 82d Cong., 2d Sess. (1952); 1-1 COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.06. On August 1, 1953, Congress adopted House Concurrent Resolution 108, declaring a policy of Congress "as rapidly as possible to make the Indians...subject to the same laws and entitled to the same privileges and responsibilities as are applicable to other citizens [and] to end their status as wards." The passage of House Concurrent Resolution 108 motivated Congressional action which led to the passage of multiple termination bills focused primarily on ending the trust relationship between the United States and Indian

14

tribes, with the ultimate goal to subject Indians to state and federal laws on the same terms as other citizens. In 1954, Congress voted to terminate 70 tribes and bands. Subsequent Congresses terminated additional tribes throughout the country. Termination bills contained many common provisions, and provided for a time period for completion of the termination process, and to allow distribution of property. The California Rancheria Act was passed during this termination period. In all, approximately 110 tribes were terminated by Congress.

Congress began to rethink its termination policy shortly after the California Rancheria Act passed. A new era of Indian policy began to form that supported government-to-government relationships between the federal government and individual Indian tribes. The Executive Branch implemented a policy to end termination by 1960, and President Nixon urged Congress to adopt a resolution officially repudiating termination.

Congress passed several acts to mark the end of its termination policy. For example, Congress passed the Indian Civil Rights Act of 1968 which repealed an earlier provision of Public Law 280 that allowed states to assume jurisdiction over Indian country unilaterally. Significantly, Congress passed the Menominee Restoration Act in 1973 ("Restoration Act"), considered to be a symbolic reversal of termination policy. 1-1 COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 1.07. The Restoration Act reinstated all rights and privileges of the tribe or its members, and authorized the Secretary of the Interior to make grants and to contract with the tribe for the provision of federal services. In 1975, Congress passed a major act of self-governance policy–the Indian Self-Determination and Education Assistance Act. Thus, although Congress did not repudiate the California Rancheria Act specifically, it enacted legislation repugnant to its previous termination policy, and moved forward with restoring many Indian lands and Tribes across the country.

In 1994, Congress passed Public Law 103-454, 108 Stat. 4791, which includes the following Congressional findings:

 "(1) the Constitution, as interpreted by Federal case law, invests Congress with plenary authority over Indian Affairs;
"(2) ancillary to that authority, the United States has a trust responsibility to recognized Indian tribes, maintains a government-to-government relationship with those tribes, and recognizes the sovereignty of those tribes;
"(3) Indian tribes presently may be recognized by Act of Congress; by the administrative procedures set forth in part 83 of the Code of Federal Regulations denominated

>"Procedures for Establishing that an American Indian Group Exists as an Indian Tribe;" or by a decision of a United States court;
>"(4) a tribe which has been recognized in one of these manners may not be terminated except by an Act of Congress;
>"(5) Congress has expressly repudiated the policy of terminating recognized Indian tribes, and has actively sought to restore recognition to tribes that previously have been terminated;
>"(6) the Secretary of the Interior is charged with the responsibility of keeping a list of all federally recognized tribes;
>"(7) the list published by the Secretary should be accurate, regularly updated, and regularly published, since it is used by the various departments and agencies of the United States to determine the eligibility of certain groups to receive services from the United States; and
>"(8) the list of federally recognized tribes which the Secretary publishes should reflect all of the federally recognized Indian tribes in the United States which are eligible for the special programs and services provided by the United States to Indians because of their status as Indians.".

25 U.S.C. §497a, directives. According to this provision, and contrary to Mr. Livingston's arguments, Congress "expressly repudiated" the termination policy, and expressly allows a tribe to become federally-recognized after termination "by a decision of a United States Court."

In addition, the function of the judiciary is to interpret acts of Congress and the execution of those acts by the executive branch. In the *Hardwick* litigation, the plaintiffs challenged the California Rancheria Act and questioned whether the executive branch complied with that law before terminating the tribes and the trusts. In the 1983 Stipulation and final judgment, it was determined that the executive branch failed to comply with the law, making the termination of the rancherias ineffective. The *Hardwick* court had the authority as a co-equal branch of government to review the law and the Department's execution of it.

**3.     Whether the *Hardwick* Stipulations "Unterminated" the California Rancheria Act and "Restored" the Picayune land on which the Casino Operated to a Reservation**

In the 1983 Stipulation, the Department admitted that the United States failed to comply with the Rancheria Act in terminating the Picayune Rancheria and distributing its assets. The Department agreed, among other things, to restore the federal recognition of Picayune Rancheria and its members, to accept in trust certain lands formerly belonging to the tribe, and to process applications for land into trust for other parcels of land. The Plaintiffs agreed, among other things, to release the Defendants and the rest of the federal government from liability arising out of the litigation, to discharge the Department of Health and Human Services from any claims arising after the implementation of the Rancheria Act and

1  before the restoration of recognition, and to dismiss its claims with prejudice.  Although the 1983
2  Stipulation did not set the boundaries for the Picayune tribal lands, the Court retained jurisdiction to
3  resolve this issue "in further proceedings herein."  The United States agreed to this provision, which
4  ultimately became a final judgment of the court.

5   Pursuant to the 1987 Stipulation, the "original boundaries" of the rancheria was "restored, and
6  all land within these restored boundaries...[was] declared to be 'Indian Country.'" The parties agreed
7  further that Picayune Rancheria "shall be treated by the County of Madera and the United States of
8  America, [sic] as any other federally recognized Indian Reservation." According to Stipulation, then,
9  the land in question was restored, declared to be "Indian Counties," and the Picayune Rancheria "shall
10 be treated as a...Reservation." According to these provisions, the Casino, located within the original
11 boundaries of the rancheria, restored, and declared to be treated as a reservation, qualified as "Indian
12 land" pursuant to 25 U.S.C. §2703(4)(A).

13  Mr. Livingston argues that the parties could not stipulate to overturn an act of Congress.  The
14 1987 Stipulation, however, is a stipulated judgment that was entered by the court.  "The Stipulated
15 Judgment in this case is not a settlement agreement but is a legally enforceable judgment subject to Rule
16 60(b)."*Wilton Miwok Rancheria v. Salazar*, 2010 WL 693420 (N.D. Cal. 2010) (holding that the 1983
17 Stipulation is a legally enforceable judgment). *See also, e.g., Rufo v. Inmates of Suffolk County Jail*, 502
18 U.S. 367, 378 (1992) ("There is no suggestion in these cases that a consent decree is not subject to Rule
19 60(b). A consent decree ... is an agreement that the parties desire and expect will be reflected in, and be
20 enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and
21 decrees."). Because Congress delegated its authority to allow courts to recognize federally Indian tribes
22 that were terminated under its termination policies, as set forth above, the judgments of the *Hardwick*
23 court may restore the Picayune Tribe and its lands, declare the lands to be "Indian country," and declare
24 that the land shall be treated as a reservation.

25  Mr. Livingston further argues that the 1987 Stipulation cannot restore the Tribe, as a matter of
26 law, because the United States was not a party to it.  Although the United States did not sign the 1987
27 Stipulation, the United States has consistently considered itself bound by the terms of the 1987
28 Stipulation, including the restoration of the Tribe and its lands to the original boundaries.  In 2000 and

2001, the Department and the NIGC both made findings that the land was "Indian land" based on their belief and agreement that the government is bound by the 1987 Stipulation. Since 1987, several challenges have arisen as to the status of the land. Despite these challenges, the government has never waivered from its position that it is bound by 1987 Stipulation. The government's failure to challenge the judgment strongly suggests the conclusion that it is bound to the terms of the agreement through legal acquiescence.

In addition, the agencies' findings that land constituted "Indian land" based on the 1987 Stipulation, among other things, is evidence that Casino was operating pursuant to an NIGC approval of a gaming ordinance, to satisfy the element of the crime. During the relevant time period, there was an NIGC approval of the Tribe's ordinance, a Department opinion letter that the land was Indian land, and an NIGC opinion that the land was Indian land. The government reiterated its position that it is bound by the 1987 Stipulation in a May 7, 2007 opinion letter.

The Department has authority from Congress to establish tribal status. Courts have consistently upheld this authority. *See, e.g., Miami Nation of Indiana, Inc. v. U.S. Dep't of Int.*, 255 F.3d 342, 346 (7th Cir. 2001) ; *James v. United States Dep't of Health & Human Servs.*, 824 F.2d 1132, 1137 (D.C. Cir. 1987). As set forth above, Congress allows the Department to handle Indian affairs. 25 U.S.C. §497a. But Congress delegated its authority to recognize Indian tribes federally to the executive branch long before 1994. In 1978, Congress passed 25 U.S.C. §§2, 9 to allow the Bureau of Indian Affairs to manage "all Indian affairs...all matters arising out of Indian relations." Thus, the Department has the authority to make these interpretations, and this Court should accord "considerable weight" to the "executive department's construction of a statutory scheme it is entrusted to administer." *Chevron, U.S.A., Inc. v. Nat. Resources Defense Council, Inc.*, 467 U.S. 837, 844 (1984).

Mr. Livingston asserts that every court that considered the 1987 Stipulation has rejected the government's position that it restored the land to a rancheria. This Court disagrees. The post-*Hardwick* opinions relate only to tax or *in rem* issues. None of the opinions addresses whether the land was "Indian land" during the relevant time. Although the Tribe attempted to get declaratory relief on the issue, the case settled and the land was taken into trust without a post-1987 opinion on the issue of Indian lands. Moreover, none of the opinions suggests that the 1983 and 1987 Stipulations did not

restore the land. In fact, in the last opinion, the court found that the Tribe established federal subject matter jurisdiction on its declaratory judgment act claim, based on the argument that the land constituted "Indian County" pursuant to the 1987 Stipulation. Moreover, the court did not vacate its judgments entered after the 1983 and 1987 Stipulations. As it stands, the 1983 and 1987 Stipulated Judgements are in effect and enforceable. Accordingly, the case law does not establish that the Casino was not operating on Indian land during the relevant period of time.

The Court further questions whether this particular forum and this particular motion are appropriate to question or interpret the *Hardwick* judgments or the agency opinions. The Court has doubts as to whether this Court has jurisdiction to interpret the 1987 Stipulation, as the Northern District of California retained exclusive jurisdiction over those matters in its 1983 Stipulated Judgment. In addition, a party may challenge the approval of the ordinance, the Department's legal opinion and determination, and NIGC's opinion either within the appropriate administrative procedure or through a separate action pursuant to the Administrative Procedures Act. *See, Hein v. Capitan Grande Band of Diegueno Mission Indians*, 201 F.3d 1256, 1261 (9th Cir. 2000). This is an improper forum to attack the *Hardwick* Stipulations or the agencies' conclusions.

Congress has delegated and reaffirmed that courts and the executive branch have a role in determining federally recognized tribal status, 25 U.S.C. §§ 479a, 479a-1, and to allow the executive and judicial branches to restore the rights of terminated tribes. The 1983 and 1987 Stipulated Judgments and the government's opinion letters raise an issue as to whether the land on which the Casino operated qualified as "Indian lands" pursuant to the IGRA during the relevant time period. Accordingly, this Court finds that Mr. Livingston fails to establish as a matter of law that the Casino did not operate pursuant to the NIGC's approval of a gaming ordinance which restricted gaming to take place on "Indian land" as defined by the IGRA.

## CONCLUSION

For the foregoing reasons, this Court DENIES Mr. Livingston's motion to dismiss.

IT IS SO ORDERED.

**Dated:   September 1, 2010**              /s/ Lawrence J. O'Neill
                                            UNITED STATES DISTRICT JUDGE